# CHARLESTON.

MARSH v. DESPARD et al.

Submitted June 6, 1904.   Decided November 1, 1904..

1. EXECUTORY CONTRACT—*Rescission—Waiver.*
   An executory contract for the sale of land can be rescinded or waived in equity, by writng, or by word of mouth, if possession of the land be given up, or the writing be destroyed; but not without something done by way of rescission or waiver. (p. 140).

2. AGREEMENT—*Rescission.*
   Any circumstance or course of conduct from whence can be clearly deduced an agreement to put an end to the original contract, will amount to a rescission of it.   (p. 140).

3. EXECUTUORY CONTRACT—*Rescission.*
   A contract may be discharged by the parties thereto, or. the beneficiaries therein, by an entirely new contract, entered into by them, with reference to .the same subject·matter, the terms of which are co-extensive with, but repugnant to, the original contract.   (p. 139).

Appeal from Circuit Court, Harrison County.

Bill by James W. Marsh against Charles S. Despard and others.   Decree for plaintiff.   Defendants appeal.

*Reversed.*

JOHN BASSEL, for appellants.

DAVIS & DAVIS, for appellee.

MILLER, JUDGE:

By contract in writing, bearing date on the 10th day of February, 1872, Burton Despard, by James M. Lyon, his agent, sold to appellee James W. Marsh, a tract of eighty-two acres of land, situate on the waters of Grass Run, in Harrison County, (described in the contract by metes and bounds,) at nine dollars per acre, fifty dollars of which was paid in cash, by Marsh at the date of the contract; fifty dollars thereof was to be paid when Despard and wife should convey the land to Marsh by deed with covenants of general warranty; the res-- idue of the purchase money was to be paid in six equal annual

installments with interest from the date first aforesaid, and the entire interest was to be paid annually.

On the 17th day of October, 1872, Marsh paid to Despard an additional fifty dollars on said purchase money, for which Despard gave to him a receipt, specifying therein that the payment was on account of purchase money for about eighty-two acres of land on Grass Run, sold to Marsh by James M. Lyon, as Despard's agent. Marsh went upon the land, built a house and barn thereon; cleared about fifty acres thereof; and put out an orchard of apple and peach trees, and has had actual and continuous possession thereof ever since, but Despard never executed to him a deed for the land. Despard died testate in October, 1874, leaving him surviving several children and heirs at law, who, by the provisions of his will, were to share equally in the partition and distribution of the testator's estate. Edwin Maxwell qualified as executor of the will. On the 6th day of December, 1881, Marsh paid to Maxwell as executor one hundred dollars on his debt to B. Despard for land. The note of Marsh to Despard for purchase money of the land, as well as the title bond to Marsh for said land, were found among Despard's papers after his death and came to Maxwell's hands as his executor. No other payment on said purchase money was ever made by Marsh. In 1883, the real estate of said Despard, deceased, was partitioned among, and allotted to, the persons entitled thereto, by decree of the circuit court of Harrison county, in a suit brought and prosecuted for that purpose. Appellant, C. S. Despard, being a son and devisee, was entitled to participate in the partition and allotment. To him was assigned by said decree three hundred and eighteen acres of land on Grass Run, in said county; and two store rooms in the town of Clarksburg. The land does not appear to have any other description in the decree of partition. It is shown that Despard, at the time of his death, owned no tract of three hundred and eighteen acres on Grass Run; that the commissioners, who made the partition and allotment, did so without going upon the lands, from surveys and plats found among decedent's papers; that the decedent had also owned a tract of one hundred and twenty-four acres on Grass Run which had been sold to one Goodwin; and that the one hundred and twenty-four acres and eighty-two acres were assessed and charged to

Despard on the land books with taxes; that said Marsh was never assessed with, or paid any taxes on said eighty-two acres; that no lands on Grass Run were found, after said partition in which decedent had any interest at the time of his death, except said one hundred and twenty-four, and eighty-two acres, respectively, and that said tracts were not contiguous.

On the 16th day of November, 1889, having been advised as to his rights in the premises, by Judge Nathan Goff, of Clarks-burg, who was a son-in-law of Burton Despard, Marsh executed to the Harrison County Oil & Gas Company, a lease upon said eighty-two acres for oil and gas purposes. Marsh says in his testimony that he knew at the time that Judge Goff was a lawyer and a son-in-law of Despard, and that Goff told him that it was his (Marsh's) land. In April, 1893, the appellant, C. S. Despard, went to Grass Run to locate the lands assigned to him as aforesaid. He found the one hundred and twenty-four acre tract, and was told that Marsh lived on eighty-two acres that had formerly belonged to Burton Despard. He called upon Marsh at his home on the land, and informed him that this tract was a part of the land allotted to him in the suit for partition by the Despard heirs. The evidence does not agree as to what was then said by appellant. Marsh testified that appellant said that the land which Marsh was then occupying was his (Despard's); that he (Despard) had a deed for it, and remarked that wherever he found any land unoccupied, which had orig-inally belonged to his father, he intended to take it; and fur-ther stated that, if he (Marsh) intended to stay on that land he would have to lease it. It further appears that Marsh then told appellant that he had bought the land of his father, and ex-pected a deed therefor from the Despard heirs. This conver-sation is, in part, denied by appellant, who says that he told Marsh that the commissioners had set apart to him three hun-dred and twenty-five acres of land; that the eighty-two acre tract was part of it; that Marsh did not mention anything about expecting a deed from the heirs; and that he told Marsh that he had a decree for the land, but did not tell him that he had a deed therefor. Hickman, who was present, says that appellant told Marsh that he had a deed for the land, and that Marsh would have to lease it or leave it. An understanding was then had between Marsh and appellant by which Marsh was after-

wards to go to Clarksburg to make some arrangement with
appellant about the land. Shortly afterwards, Marsh did go
to Clarksburg and met appellant, who says that Marsh again told
him that he had bought the land, and wanted to know what
appellant was going to do about it. Appellant said to him
that if he had bought the land, it ought to be paid for; that
appellant wanted the matter settled; that Marsh then spoke
about renting the land, but said he would first consult his law-
yer, a Mr. Scott, about it. He was afterwards seen with Mr.
Scott, an attorney. This was in the forenoon. In the after-
noon of the same day, Marsh again met appellant at the law
office of Edwin Maxwell, the executor, the said title bond being
there in the possession of Despard. Thereupon, Maxwell wrote
for the parties, and Marsh signed an agreement, which is at-
tested by Maxwell and B. M. Despard, in the following words
and figures:

"I have this day rented from C. S. Despard the tract of 82
acres of land, on Grass Run in Harrison county, where I now
reside for one year from the first day of April, 1893, for which
I am to pay $25.00 on November 1st, 1893, and $25.00 before
the 1st day of April, 1894.

"If I see proper to sow on said land a wheat crop the said
Despard reserves the right to purchase said crop and pay me
for the same, and if we can not agree I am to select a man and
he a man and they if necessary a third man, who shall say
what said Despard is to pay. If I shall sow any of the place in
either oats or wheat I am to sow grass seed on same without
any charge, the said Despard to furnish the seed for me to
sow.

"Given under my hand this 19th day of April, 1893.
"Witness,                                      J. W. MARSH.
      "Edwin Maxwell,
      "B. M. Despard."

On the 15th day of January, 1895, Marsh went to Parkers-
burg, to the home of appellant, and then and there signed
another contract, which is in the words and figures following:

"This contract made this 15th day of January, 1895, between
J. W. Marsh of Harrison County, W. Va., of the first part and
C. S. Despard of Wood County, W. Va., of the second part that
is the party of the second part has rented the party of the first

part his eighty-two acres of land on Grass Run where the party of the first part now resides upon the following terms: Commencing April 1st, 1895, that is the said Marsh, is to pay sixty-five dollars a year and said amount is to be paid on or before the 1st day of December, 1895, and to give said Despard one-half of the fruit raised upon said place and the said Marsh agrees to feed all his stock upon said place and not to move off any manure and if the said Despard should sell said land the said Marsh is to give possession of said land but the said Despard is to pay said Marsh a fair compensation for his crop if he has to give possession of said land before this lease expires and the said Marsh further agrees to take as good care of said property as it was his own and not to plow any of the sod or grass land.

"Given under my hand and seal this the 15th day of Jany, 1895.

"J. W. MARSH,        (Seal).

"C. S. DESPARD."

It is shown that, at the date of the first lease, the land was not more valuable than it was when bought by Marsh, if worth so much. It appears that the amount of purchase money and interest thereon then due from Marsh on the land was about $1,600.00. It is also shown that Marsh made no offer to pay the balance of purchase money, and did not demand a deed for the land at any time. He admits that he did not have sufficient money at any time to pay the debt. He says in his testimony: "I leased said land of C. S. Despard after his having, as I thought, made a threat that I would be ejected from said land, thinking it was the only way I could have a home for the family until I could see legal authority in regard to the matter. I never at any time said or intimated that I had no right or title to said land." Appellant says in his testimony: "I made no threat to him in any manner—he went out and consulted his lawyer as to whether he would take the land and pay for it, or turn it over to me in the place of taking it. It was optional with him to take the land under the contract, or release it, either one."

Marsh voluntarily went to Clarksburg and, for aught that appears in the record, with full knowledge of his legal rights in the premises, and after taking legal advice thereon, of his own accord, entered into said first lease. After occupying the land

for nearly two years, under this lease, he voluntarily went to the home of appellant at Parkersburg, entered into the second lease, and occupied the premises thereunder, until the time of the institution of this suit by him, in October or November, 1897. He referred to the property, during that period, as the land of appellant. Maxwell swears as follows, in reference to the possession of the said title bond by appellant: "I may have given him possession of the box containing the papers, or I may possibly have given him the paper, but my impression would be that, I gave him the box containing the paper; and, if the land was assigned to him by the commissioners, there is no reason that occurs to me now, why he might not have properly taken the paper."

Thus it appears that appellant had the title bond with the assent of Maxwell, executor; that the whole arrangement was understood and acquisced in by the executor, Marsh and appellant, when the first lease was made to Marsh, and accepted by him in Maxwell's office.

At the January Rules, 1898, Marsh filed his bill in equity against said C. S. Despard, and the other children and heirs at law, of Burton Despard, deceased: Gertrude Despard, widow; and Edwin Maxwell, executor, setting up the facts connected with the purchase of said land, showing the said payments on the purchase money therefor, and praying a specific execution of said contract; and also that a deed for the land might be decreed to him from said heirs.

Appellant, C. S. Despard, answered the bill, and relied, as a defense thereto, upon the facts hereinbefore recited.

On the 21st day of January, 1899, the cause was heard, and a decree made and entered therein, by which it was, and is adjudged, that plaintiff is entitled to a specific execution of said contract, upon the payment of the balance of the purchase money due and unpaid upon said land, on that day, amounting to $1,798.48, the payment of which is required within ninety days thereafter; that upon its payment, the said C. S. Despard and the other children and heirs at law of Burton Despard, deceased, are required to execute, acknowledge and deliver to Marsh, a deed for said land with covenants of general warranty, but upon their failure so to do a special commissioner who was.appointed by the decree, was authorized to execute and deliver such deed

for them. From this decree said C. S. Despard obtained an appeal and *supersedeas*.

Summarized, the case is thus presented: In February, 1872, Marsh bought the land; thereafter took possession thereof; and made permanent improvements thereon. Up to, and including, December 6, 1881, he had paid but $200.00 on the purchase money. He was never charged with, nor paid, any of the taxes on the land. He was fully advised as to his legal rights in the premises. He knew that he was entitled to a deed therefor upon payment of the balance of purchase money with its interest. C. S. Despard, under the said decree of partition, held the legal title to the land and was entitled to this purchase money. On the 19th day of April, 1893, the amount of this purchase money and its interest amounted to about $1,600. Marsh did not then have the money with which to pay it. That he might remain on the land with his family, he, on that day, voluntarily leased the land from appellant. On the 15th day of January, 1895, he again voluntarily leased it, having occupied it until the date last aforesaid almost two years under his first lease. He again held and occupied the premises as tenant of appellant, until the institution of this suit. Just before that time, he had refused to pay rents to appellant and was notified to surrender possession of the premises.

Appellant insists that the said contract of February 10, 1872, was rescinded by mutual consent of himself and Marsh; that appellee became his tenant by said two written leases, and had thereby surrendered his possession of the land, to appellant and was therefore not entitled to specifically enforce the said contract. The ownership of the land by Despard having been acknowledged by Marsh in the leases, and admitted by him in accepting the tenancy thereof, the legal possession of the land by Despard necessarily followed. 1 Taylor, Land & Tenant, section 86. Appellee contends that he consented to become Despard's tenant in ignorance of his rights; and by reason of the fraud, misrepresentation and intimidation by Despard. We think no fraud or intimidation is proved. There is some conflict in the evidence as to whether Despard said to Marsh that he had a deed or decree for the land; but in the view we take of the case, this apparent contradiction is not material. After this interview with Despard, and after he had consulted an attorney

at Clarksburg, where the records were accessible, and would have shown the facts about Despard's claim to the land, Marsh voluntarily leased the premises from Despard. But admitting that Marsh was ignorant of his rights, which is not shown, he is in no better plight. "The presumption is, that every person is acquainted with his own rights, provided he has had a reasonable opportunity to know them. And nothing can be more liable to abuse than to permit a person to reclaim his property upon the mere pretense that at the time of parting with it, he was ignorant of the law acting on his title. Mr. Fonblanque has accordingly laid it down as a general proposition that in courts of equity, ignorance of the law shall not affect agreements, nor excuse from the legal consequences of particular acts. And he is fuly borne out by authorities." 1 Story Equity (13th Ed.) pp. 121, 122, and cases cited.

Appellee further contends that the agreements and leases between himself and C. S. Despard did not, and do not, amount to a rescission of the original contract, because the contractual obligations and rights of Burton Despard at his death passed to Maxwell, his executor, who alone could enforce them. We think the proposition is not applicable here. It is plainly evident that the decree of partition passed to C. S. Despard, the legal title to said eighty-two acres. He was not bound to part with his title until Marsh should pay to him the balance of the purchase money with its interest due on the land. It is true that Maxwell, as executor, was the personal representative of Burton Despard, and as such was charged with the collection and disbursement of that and other claims due the estate. But when the first lease was made to Marsh, Maxwell, presumably at the request of the parties, drafted it, and the title bond was present in the possession of Despard, who then and there agreed to release it. The debt of Marsh was thus cancelled, and Maxwell thereby discharged from further duty in relation thereto.

Hammon on Contracts, section 426, says: "The parties to a contract may discharge it by substituting in its place a new contract. This may occur in any one of three ways, each of which has the same effect; First, the parties may enter into an entirely new contract with reference to the same subject matter, the terms of which are co-extensive with and repugnant to the terms of the original agreement." * * * The parties in interest did

make such new agreement, by the execution and acceptance of the leases, Maxwell, executor, being present and acquiescing therein.

The language of the first lease, being the words of Marsh, after he signed the same, plainly show that he considered the land the property of appellant. The second lease again recognizes Despard as the owner, and Marsh as the tenant. It says, the party of the second part (Despard) has rented to the party of the first part, his (Despard's) eighty-two acres of land, where the party of the first part now resides, upon the following terms: * * * "And, if the said Despard should sell said land, the said Marsh is to give possession of said land, but the said Despard is to pay said Marsh a fair compensation for his crop, if he has to give possession of said land before the lease expires."

In *Cunningham* v. *Cunningham,* 46 W. Va. 1, 4, the Court says: "There is no doubt, but that an executory contract for the sale of the land, whether written or oral, can be rescinded or waived, in equity by word of mouth, if possession be given up, or the writing be destroyed, but not without something done by way of rescission or waiver." *Beggs* v. *Bodkin,* 32 W. Va. 566; *Straley* v. *Perdue,* 33 W. Va. 375; *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501, 511. "Any circumstance or course of conduct from whence can be clearly deduced an agreement to put an end to the original contract, will amount to a rescission of it." Fry. Spec. Per. section 677. The rescission of a contract necessarily constitutes a bar to the performance of it by either party." Fry, *supra,* section 682. Having become the tenant of Despard and accepted and held the possession of the eighty-two acres of land from 1893 to 1897, under said leases, Marsh will not be allowed now to dispute the title of his landlord, the appellant. 2 Taylor, Landlord & Tenant, 629, and cases cited.

We are of opinion that the contract of February 10, 1872, was rescinded by the parties interested therein, and that Marsh, by the leases, surrendered the land to, and became the tenant of, Despard. For the reasons stated, the decree of the circuit court is erroneous.

We therefore reverse the same, and dismiss the plaintiff's bill.

*Reversed.*